IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| LISA A. MUCKELVANEY, ) | Civil Action No. 3:05-1018-JFA-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

On July 1, 2003, Plaintiff applied for DIB. Plaintiff's application denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). After a hearing held September 10, 2004, at which Plaintiff appeared and testified, the ALJ issued a decision dated November 16, 2004, denying benefits and finding that Plaintiff was not disabled as of December 31, 2000, the date she was last insured for purposes of DIB. The ALJ, after hearing the testimony of a vocational expert ("VE"), concluded that work exists in the national economy which Plaintiff could perform.

Plaintiff was thirty years old at the time she alleges she became disabled and thirty-five years old at the time her insured disability status expired. She has an eleventh or twelfth-grade education

and past relevant work as a cashier. Plaintiff alleges disability since May 1, 1995, due to spinal problems, fibromyalgia, seizures, and depression.

The ALJ found (Tr. 28-29):

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits through December 31, 2000, the date her disability insured status expired.

2. The claimant did not engage in substantial gainful activity since May 1, 1995 (the alleged onset of disability) through December 31, 2000 (the date her disability insured status expired).

3. The claimant's degenerative disc disease and bipolar disorder are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. During the period in issue, the claimant has the residual functional capacity for light work. During this period she was restricted from climbing and crawling. She was to have a sit/stand option at will. She was not to be exposed to hazards. She was not to be exposed to crowds. She was to work in no more than a low-stress, non-sequential production setting.

7. During the period in issue, the claimant was unable to perform any of her past relevant work (20 CFR § 404.1565).

8. The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

9. The claimant has a 'high school (or high school equivalent) education" (20 CFR § 404.1564).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.17 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as housekeeper and a bander.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through December 31, 2000 (the date disability insured status expired).

On January 28, 2005, the Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final action of the Commissioner. Plaintiff filed this action on April 4, 2005.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

**DISCUSSION**

Plaintiff alleges that: (1) the ALJ erred in failing to make a single finding concerning Plaintiff's mental illness where she alleged that she met the listing of impairments ("Listings"), 20 C.F.R. Part 404, Subpart P, Appendix 1 for mental illness in her pre-hearing order; and (2) the ALJ showed extreme bias in failing to consider reasons for the Plaintiff's anxiety, fear, and anorexia. The Commissioner contends that substantial evidence supports the decision of the Commissioner that Plaintiff was not disabled.

A.   Substantial Evidence

Plaintiff appears to allege that the ALJ's decision is not supported by substantial evidence. Substantial evidence is:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence".

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

The ALJ's determination that Plaintiff was not disabled at any time through December 31, 2000 (the date Plaintiff's disability insured status expired), is supported by substantial evidence. Significantly, none of Plaintiff's treating or examining physicians or psychologists found that she was disabled or placed anything more than temporary restrictions on her ability to perform work. See Lee v. Sullivan, 945 F.2d 687, 693 (4th Cir. 1991)(finding that no physician opined that claimant was totally and permanently disabled supported a finding of no disability); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)(treating physician's opinion entitled to great weight).

The ALJ's determination that Plaintiff, despite her back impairment,[1] could perform a significant range of light work with a sit/stand option that did not require climbing, crawling, or exposure to hazards is supported by substantial evidence. From June 1994 to November 1998, Plaintiff was treated by Dr. Dan W. B. Hibner and other medical professionals at Flowertown Family Physicians for various complaints including low back and bilateral leg pain, headaches,[2] and upper respiratory infections. Tr. 98-114. An x-ray of Plaintiff's lumbar spine on June 22, 1995 revealed L5-S1 degenerative disk disease. There was mild disk space loss at L5-S1, but otherwise normal disk spaces and alignment. Plaintiff's sacroiliac joints and hip joints were unremarkable. Tr. 113. On June 26, 1995, Dr. Hibner diagnosed possible acute central disk at L4-5, L5, and S1 and referred Plaintiff to Dr. Thomas H. Dukes, III, a neurologist. Tr. 112.

On June 27, 1995, Dr. Dukes noted that Plaintiff had tenderness over her lower lumbar spine, no significant paraspinal muscle spasms, marked limitation of motion of her lumbosacral spine, positive straight leg testing, pain with flexion of her neck, no atrophy or fasciculation, no motor deficits of her lower extremities, and no definite weakness. Dr. Dukes assessed that Plaintiff most likely had lumbar radiculopathy at L5 with no neurological deficits. He recommended conservative treatment and prescribed Flexeril and Toridol. Dr. Dukes opined that he did not believe Plaintiff should be working at that time (as a cashier at a convenience store) because of the requirements that she lift cases of drinks. Tr. 120-121. On July 7, 1995, Plaintiff returned and reported minimal

---

[1] Although Plaintiff also alleged that she was disabled due to fibromyalgia and seizures, she has presented no evidence that she was treated for either of these impairments during the relevant time period.

[2] On April 9, 1998, Dr. Hibner noted that Plaintiff's headaches were well controlled with Fioricet. Tr. 101. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." Gross v. Heckler, 785 F.2d 1163, 1165-6 (4th Cir. 1986).

improvement. Straight leg raising was positive, but Plaintiff had no motor or sensory deficits in her lower extremities and she had no neurological dysfunction. Dr. Dukes suspected lumbar radiculopathy and continued Plaintiff on conservative management with limited activity and no work. Percocet and Valium were prescribed. Tr. 119. On August 10, 1995, Plaintiff reported considerable improvement. She denied numbness, paresthesias, and motor loss. Plaintiff was able to heel and toe walk, she had positive straight leg raising at 45 degrees; she had tenderness over the lumbar area; she had no atrophy or fasciculation; and she had no motor or sensory deficits in her lower extremities. Conservative treatment was continued with instructions for Plaintiff to gradually reduce her doses of analgesics and Valium; to increase her activities; and to avoid lifting, bending, and squatting activities. Tr. 118.

An x-ray of Plaintiff's left ankle was negative on July 6, 1996. On October 2, 1996, x-rays of her sacrum and coccyx showed no evidence of a fracture or dislocation. Tr. 110-111.

X-rays of Plaintiff's lumbar spine on September 22, 1998 showed degenerative disc disease at L5 and S1 and spina bifida occulta[3] at S1. Tr. 100. On September 24, 1998, Plaintiff complained to medical providers at Flowertown Family Physicians about low back pain and bilateral pain down her legs. Tr. 99. Plaintiff was scheduled for an MRI, but there is no indication that it was done. When Plaintiff was next examined at Flowertown Family Physicians on December 2, 1998, she complained only of an upper respiratory infection and a vascular headache. Tr. 98-99.

---

[3]Spina bifida is a developmental abnormality which is characterized by a defective closure of the vertebral arch. Occult spina bifida or spina bifida occulta is "spina bifida in which there is a defect of the vertebral arch without protrusion of the spinal cord or meninges." Dorland's Illustrated Medical Dictionary 1736 (30th ed. 2003).

Plaintiff does not appear to have sought any medical treatment again until over one year later on February 15, 2000, when she was treated by orthopaedist Dr. Michael Maginnis for a left arm injury. Examination revealed that Plaintiff moved fairly freely, her stance and gait were normal, she had normal range of motion of her neck, and she had no tenderness along her spine. Tr. 125. Plaintiff was treated by George F. Warren, an orthopaedist in practice with Dr. Maginnis, from February 15 to April 6, 2000 for complaints of back and leg pain. Tr. 122-124. On March 2, 2000, an MRI of Plaintiff's lumbar spine revealed degenerative changes at L5-S1 with mild osteophyte production, but without evidence of nerve root compression, disc herniation, or other abnormalities. Tr. 131-132. Dr. Warren reviewed the MRI on March 9, 2000, and concluded that Plaintiff did not have a serious disc problem. On April 4, 2000, Plaintiff told Dr. Warren that she had scheduled an appointment with a neurologist and he encouraged her to do so as he had gone to the extent that he could to be helpful to her. Tr. 122. There is no indication that Plaintiff followed up with a neurologist or sought any other medical treatment from April 2000 until well after December 31, 2000.

The ALJ's determination that Plaintiff, despite her mental impairments, could perform work that required no exposure to crowds and work in no more than a low-stress, non-sequential production setting, is supported by substantial evidence. Contrary to Plaintiff's argument that the ALJ "failed to make a single finding concerning the claimant's mental illness and disability", the ALJ specifically included in his findings, at number three, that Plaintiff had the severe mental impairment of bipolar disorder. Tr. 29. In the "Evaluation of the Evidence" section of his decision,

7

the ALJ wrote that Plaintiff's anxiety and bipolar disorder were severe. Tr. 22.[4] Based on these impairments, the ALJ found that Plaintiff had the mental residual functional capacity ("RFC") to perform work that required no exposure to crowds and work in no more than a low-stress, non-sequential production setting. Tr. 26.[5]

Plaintiff's mental impairments were treated at Charleston County Mental Health ("CCMH") between October 18, 1996 and April 4, 1997 with medication and individual and group therapies. Tr. 213-217. On October 18, 1996, Plaintiff was diagnosed with "Major Depression, Rec[urrent] vs Bipolar II D2." Prozac and Depakote were prescribed. Tr. 213. By January 15, 1997, Plaintiff reported significant improvement of depression and anxiety. It was noted that she looked brighter and her mood was improved. Tr. 217. On January 20, 1997, Dr. Hibner reported Plaintiff suffered a stab wound to her thigh which was either intentional or accidental, but that her spouse supported her account of accidental injury. Plaintiff was not committed to a hospital as a result of the incident and Dr. Hibner noted that Plaintiff was receiving counseling. Tr. 109. The same day, a CCMH physician increased Plaintiff's Depakote dosage. Tr. 216. On February 14, 1997, it was reported that Plaintiff's depression was significantly improved, but that she had increased anxiety. It was noted that Plaintiff's Depakote level needed to be increased based on her weight. Plaintiff did not

---

[4] Although the ALJ failed to include that Plaintiff had the severe impairment of anxiety in the "Findings" section of his decision, this appears to be harmless error, as the ALJ discussed Plaintiff's anxiety in the "Evaluation of the Evidence" section, noted that her anxiety was a severe impairment, considered her anxiety in determining her mental residual functional capacity, and included these limitations in his hypothetical to the VE (Tr. 246).

[5] Unfortunately, Plaintiff suffered significant mental impairments well after the relevant time period. Beginning in approximately October 2003, Plaintiff began a series of inpatient admissions and counseling. See Tr. 167-212. As noted by the ALJ (Tr. 17), much of Plaintiff's testimony related to her then current condition which included rather limited activities of daily living. The hearing, however, occurred over three and one-half years after Plaintiff's disability insured status expired.

8

show up for CCMH appointment on March 21, 1997. Tr. 215. On April 4, 1997, CCMH notes indicate that Plaintiff had been prescribed Prozac and Depakote without any report of side effects, when she was last seen by the physician (February 19, 1997) she reported improvement on medication, she should stay on medication, and CCMH services were terminated because Plaintiff dropped out of treatment. Tr. 214. On April 9, 1998, Dr. Hibner noted that Plaintiff had anxiety disorder that was stable with appropriate use of Xanax. Tr. 101.

Plaintiff complains that the ALJ did not consider the reasons for Plaintiff's anxiety, fear, and anorexia. Plaintiff also appears to argue that Plaintiff was hospitalized for mental impairments prior to her onset date and the ALJ should have further considered such hospitalizations. The record does not contain any of these medical reports and any hospitalizations appear to have occurred well before Plaintiff's alleged onset date. Although Plaintiff was diagnosed with anorexia nervosa prior to the relevant time period, the medical record reveals no treatment during the relevant time period. In October 1996 and April 1997, Plaintiff's anorexia was noted to be in remission. Tr. 213-214.

The ALJ's decision is also supported by Plaintiff's testimony. At the hearing, Plaintiff testified that she began experiencing her current (September 2004) mental problems, including concentration difficulty and low self esteem, only eighteen months previously (well after the relevant time period). Tr. 227-228, 232, 244. Prior to her alleged onset date, Plaintiff was able to work and testified at the hearing that she only infrequently missed work due to mental impairments. See Tr. 245.

The ALJ's decision is also supported by the finding of State agency medical consultants. See 20 C.F.R. §§ 404.1527(f)(2) and 416.927(f)(2); SSR 96-6p ("Findings of fact made by State agency ... [physicians ]... regarding the nature and severity of an individual's impairments must be

9

treated as expert opinion of non-examining sources at the [ALJ] and Appeals Council level of administrative review."). On September 11, 2003, a State agency psychiatrist completed a "Psychiatric Review Technique" form (for the period ending December 31, 2000) and found that Plaintiff had no severe impairments under the categories of affective disorders or anxiety-related disorders. Tr. 145-158.

On September 25, 2003, a State agency physician determined that as of December 31, 2000, Plaintiff retained the physical RFC to lift twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour day; push/pull within her lifting ability; balance, kneel, and crouch frequently; climb, stoop, and crawl occasionally; and she had no manipulative, visual, communicative, or environmental limitations. Tr. 159-166. On March 8, 2004, a second State agency physician concurred with the September 25, 2003 State agency physician's physical RFC. Tr. 166.

Further, the ALJ's decision is supported by non-medical evidence. During the relevant time period, Plaintiff performed light household cleaning and other chores, drove an automobile, and traveled out of town. Tr. 101, 118-119.

B.    Listings

Plaintiff appears to allege that the ALJ erred in failing to find that she met one of the Listings. In her pre-hearing brief, Plaintiff alleged that she met the Listings at § 12.03 for multiple personality disorder with hallucinations and § 12.04 for severe depression. The Commissioner contends that Plaintiff fails to show that she met the Listings because the record did not show that she demonstrated that she experienced any of the symptoms with the consistency, frequency, and significance indicative of a clinical pattern which satisfies the requirements of § 12.04.

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment. 20 C.F.R. § 404.1525(d); see Bowen v. Yuckert, 482 U.S. 137 (1987)(noting the claimant has the burden of showing that his impairment is presumptively disabling at step three of the sequential evaluation and that the Act requires him to furnish medical evidence regarding his condition). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. Medical equivalence can be found if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526(a).

Although Plaintiff appears to argue that she met the Listings at § 12.03, the medical record does not support a finding that she met any part of the requirements prior to December 2000. At the time Plaintiff was last insured, Section 12.03 required that a claimant meet both A and B or meet C below:

> A. Medically documented persistence, either continuous or intermittent, of one or more of the following:
>    1. Delusions or hallucinations; or
>    2. Catatonic or other grossly disorganized behavior; or
>    3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:
>       a. Blunt affect; or
>       b. Flat affect; or
>       c. Inappropriate affect; or
>    4. Emotional withdrawal and/or isolation; AND
>
> B. Resulting in at least two of the following:
>    1. Marked restriction of activities of daily living; or
>    2. Marked difficulties in maintaining social functioning; or
>    3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

        4.      Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors); OR

C.    Medically documented history of one or more episodes of acute symptoms, signs and functional limitations which at the time met the requirements in A and B of this listing, although these symptoms or signs are currently attenuated by medication or psychosocial support, and one of the following:
    1.    Repeated episodes of deterioration or decompensation in situations which cause the individual to withdraw from that situation or to experience exacerbation of signs or symptoms (which may include deterioration of adaptive behaviors); or
    2.    Documented current history of two or more years of inability to function outside of a highly supportive living situation.

Additionally, Plaintiff fails to show that she met or equaled the Listings at § 12.04 because, during the relevant time period, Plaintiff's medical records do not show that she experienced any of these symptoms with the consistency, frequency, and significance that satisfied the requirements. At the time Plaintiff was last insured, Section 12.04 required that a claimant satisfy both parts A and B below:

A.    Medically documented persistence, either continuous or intermittent, of one of the following:
    1.    Depressive syndrome characterized by at least four of the following:
        a.    Anhedonia or pervasive loss of interest in almost all activities; or
        b.    Appetite disturbance with change in weight; or
        c.    Sleep disturbance; or
        d.    Psychomotor agitation or retardation; or
        e.    Decreased energy; or
        f.    Feelings of guilt or worthlessness; or
        g.    Difficulty concentrating or thinking; or
        h.    Thoughts of suicide; or
        i.    Hallucinations, delusions or paranoid thinking; or
    2.    Manic syndrome characterized by at least three of the following:
        a.    Hyperactivity; or
        b.    Pressure of speech; or
        c.    Flight of ideas; or
        d.    Inflated self-esteem; or
        e.    Decreased need for sleep; or

        f.       Easy distractibility; or
        g.      Involvement in activities that have a high probability of painful consequences which are not recognized; or
        h.      Hallucinations, delusions or paranoid thinking; or
3.    Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); AND

B. Resulting in at least two of the following:
1.    Marked restriction of activities of daily living; or
2.    Marked difficulties in maintaining social functioning; or
3.    Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
4.    Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

The record reveals that Plaintiff began treatment at CCMH in October 1996 and by January 15, 1997 she reported significant improvement with anxiety and depression, she had an improved mood, and she had a brighter appearance. Tr. 217. Although Plaintiff suffered what was termed a normal grief reaction in February 1998, medical providers at Flowertown Family Practice noted that she had a normal affect and her insight and judgment were good on April 9, 1998. Tr. 101, 103.

Additionally, Plaintiff fails to show that she met part B of either § 12.03 or § 12.04. The ALJ specifically found that Plaintiff's anxiety and bipolar disorder resulted in mild restrictions in Plaintiff's activities of daily living; no limitations in her social functioning; mild deficiencies of concentration, persistence, or pace; and no episodes of deterioration or decompensation in work or work-like settings. He also found that Plaintiff did not suffer from a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the Plaintiff to decompensate; a history of one or more years inability to function outside a highly supportive living arrangement with an indication of

continued need for such arrangement; or a complete inability to function independently outside the area of one's home.  Tr. 26.

## CONCLUSION

Despite Plaintiff's claims, she fails to show that the Commissioner's decision was not based on substantial evidence.  This Court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson v. Perales, supra.  Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, Blalock v. Richardson, supra.  The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion.  Shively v. Heckler, supra.  It is, therefore,

RECOMMENDED that the Commissioner's decision be affirmed.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

August 15, 2006
Columbia, South Carolina